ams

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ED HOLT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-4050-JAR |
| | ) | |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM & ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT & DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on cross motions by the parties: plaintiff Ed Holt's Motion for Summary Judgment (Doc. 35) and defendant Continental Casualty Company's (Continental) Cross Motion for Summary Judgment (Doc. 42). There is no genuine issue of material fact precluding a determination that Continental reasonably interpreted the terms of the long term disability plan, nor any such issue of fact precluding a conclusion that Continental's denial of benefits was supported by substantial evidence. For these and other reasons stated below, Continental's summary judgment motion is granted, and plaintiff's summary judgment motion is denied.

## I. Uncontroverted Facts

The following facts are either uncontroverted or stipulated. Plaintiff was employed by PRC, Inc. (PRC), as a Technician II, repairing color monitors. Plaintiff participated in a group long-term disability plan (the Plan), which is administered through an insurance contract that PRC purchased from Continental.

On April 6, 2000, plaintiff submitted an initial claim for benefits under the Plan, claiming that September 22, 1999 was the date he last worked prior to his current disability.  Under the terms of the plan, benefits are payable from the day following satisfaction of the 180-day elimination period, which begins on the date that the participant becomes disabled.  Benefits continue to be payable until the participant's 65th birthday if the participant is 61 years of age or younger on the onset date of disability. Plaintiff was born on March 8, 1941, such that he was 58 years old on the alleged onset date and 61 years old when he submitted his initial claim for benefits under the Plan.

Based on plaintiff's class of participation in the Plan, if found continuously disabled, his benefit would be 60% of his monthly earnings subject to a reduction of any deductible source of income listed in the Plan, such as social security disability benefits.  The Social Security Administration found that plaintiff was disabled, as defined in the Social Security Act, with an onset date of September 23, 1999. He was awarded social security disability benefits of $1079 per month, commencing March 2000.

Further, based on plaintiff's class of participation under the Plan, "disability" requires either satisfaction of an Occupation Qualifier or an Earnings Qualifier.[1]  The Occupation Qualifier in his case provides:

> [D]uring the *Elimination Period* and the following 12 months, *Injury* or *Sickness* causes physical or mental impairments to such a degree of severity that *You* are:
> 1. continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation*; and
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.[2]

---

[1]  The Earnings Qualifier allows for a participant to be considered disabled, based on his or her ability to earn money in any occupation for which he or she is qualified.

[2]  Words italicized in the Plan are emphasized in the original document.  The italicized words are defined further later in the Plan.

The Plan further defines "Material and Substantial Duties" as the necessary functions of the occupation that the participant is performing on the date of disability, which cannot be reasonably omitted or altered.

The Plan requires that the participant submit proof that he continues to be disabled and receive "appropriate and regular care from a doctor."  It also requires that proof of disability be based on objective medical evidence, such as clinical evidence.

The Plan further provides for a Worksite Modification Benefit:

> *We* will assist you and *Your* employer in identifying modifications *We* agree are likely to help *You* remain at work or return to work.  This agreement will be in writing and must be signed by *You, Your* employer and *Us*.  When this occurs, *We* will reimburse *Your* employer for the cost of the modification, up to the greater: 1) $1,500.00 or 2) 2 months of *Your* net Monthly Benefit.

Under the terms of the Plan, PRC is the plan administrator.  But Continental has discretionary authority, specified as: "When making a benefit determination under the policy, *We* have discretionary authority to determine *Your* eligibility for benefits and to interpret the terms and provisions of the policy."  CNA, Continental's designee, investigated claims under the Plan and rendered decisions on interpretation and eligibility.

### *Plaintiff's Initial Claim*

Plaintiff submitted his initial claim for long term disability benefits on April 6, 2000, claiming September 22, 1999 as the date he last worked prior to his current disability, and citing problems walking and standing.  Plaintiff had had knee replacement surgery on November 14, 1999.  On the claim form, plaintiff listed three primary care physicians, Doctors Fairchild, McCoy, and

Knappenberger.  Plaintiff identified only one instance of hospital confinement for the disability, on

November 24, 1999 at St. Francis Hospital.  Along with the claim form, plaintiff submitted a

Physician's Statement from Dr. Knappenberger and an Employer's Job Activities Statement.

      In a Physician's Statement dated February 22, 2000, Dr. Knappenberger, a specialist in

orthopedics, stated plaintiff's diagnosis as "severe degenerative joint disease, pattelofemoral joint, right

knee and long-standing diabetes, possible diabetic neuropathy type of pain in the lower extremity."  Dr.

Knappenberger noted that he first examined plaintiff on October 15, 1999, and had most recently

examined him on February 15, 2000.  He further noted  that plaintiff had a total right knee replacement

on November 14, 1999 and that T.E.D. hose could be used to help control swelling and range of

motion.  And, he noted that he would continue to observe and recheck plaintiff in one month.  On the

second page of the Physician's Statement, Dr. Knappenberger left blank the spaces provided for

"Physical Limitations."  He noted that plaintiff's prognosis was "unknown at this time" and that he

would recheck plaintiff on  approximately March 17, 2000.

      Along with the claim form, plaintiff also submitted an Employer's Job Activities Statement (Job

Statement), dated February 4, 2000.  This Job Statement was completed by a PRC representative,

who stated that plaintiff's job as a Technician II could be modified by assigning plaintiff to repair lighter

weight monitors.  The PRC representative further stated that on a daily basis, plaintiff's job required

five hours of sitting, one hour of standing, one hour of  walking, and one hour of bending.  The

representative also specified that on a daily basis, the job required up to four hours of lifting and up to

one hour of carrying material.

      In addition, the CNA Case Management Database indicates that plaintiff's claim included a

February 2, 2000 letter from Ann Bush, the site administrator at PRC.  Bush's letter, addressed "to whom it may concern,"explained that plaintiff spent most of his workday sitting at a workbench, except when he needed to retrieve or return an item to a shelf for inspection.  Bush stated that plaintiff's co-workers could assist him with the lifting requirements of the job.  She further stated that plaintiff would be required to walk only 225 feet from the front door to his work area and only 75 feet to the restroom.

Plaintiff's claim was initially approved for the period of March 21, 2000 through March 31, 2000, recognizing a 180-day elimination period commencing September 23, 1999 and ending March 20, 2000.  Plaintiff was awarded $468.83 for this ten-day period of disability in March. On May 30, 2000, CNA advised plaintiff that it was still investigating his eligibility due to a continuing disability after March 31, 2000.

### The Administrative Record

Between May 30 and August 7, 2000, CNA obtained medical records and conducted its investigation, before denying plaintiff's claim on August 7, 2000.  In its investigation, CNA considered a number of medical records of treating physicians.  These records include those of Dr. Fairchild, who had been plaintiff's physician since 1982, and who examined and treated plaintiff both before and after his knee replacement surgery in November 1999.[3]  The records also include those of Dr. McCoy, who on referral from Dr. Fairchild, evaluated plaintiff in May and October 1999.  CNA also considered records of Dr. Knappenberger beyond the Physician's Statement included in the initial claim.  Dr.

---

[3]  Upon initial review, CNA had received records from Dr. Fairchild for the period between October 12, 1999 through July 17, 2000.

Knappenberger had performed the knee replacement surgery in November 1999 and had continued to examine and treat plaintiff through May 2000.

The records reviewed by CNA give a chronological and contemporaneous account of plaintiff's complaints, symptoms, examination, treatment and results, from January 1999 through July 2000. Plaintiff's medical history, as recounted in Dr. Fairchild's notes, includes a diagnosis of diabetes mellitus in approximately 1982 and symptoms of peripheral neuropathy. Plaintiff had been followed by Dr. Fairchild's office for approximately fifteen years at the time of his surgery. On January 18, 1999, Dr. Fairchild noted evidence of skin lesions on the lower extremities; worse on the left leg. On April 21, 1999, although the examination primarily concerned plaintiff's diabetes, Dr. Fairchild noted that plaintiff's "main complaint is that of a painful area along the medial aspect of his left lower leg," and that "[p]inprick and vibratory sense are diminished in the toes." Dr. Fairchild advised plaintiff to notify him if these symptoms increased.

Dr. Fairchild also referred plaintiff to Dr. McCoy, a surgeon, to evaluate the possibility of total knee replacement surgery. To that end, Dr. McCoy examined plaintiff in May and October 1999; but Dr. McCoy told plaintiff he should attempt to lose weight before considering knee surgery. But, at the time of his surgery, in November 1999, plaintiff weighed 323 pounds.

Dr. Fairchild continued to see plaintiff during the time that plaintiff was being evaluated by Dr. McCoy. In July 1999, Dr. Fairchild noted that the pinprick and vibratory sense was intact in his toes and that there were no lesions on his feet or lower legs. On September 24, 1999, plaintiff presented complaining of severe pain in his right knee, which prohibited him from working. At this time, plaintiff was using a walker. Dr. Fairchild signed a work release for plaintiff until he was evaluated by Dr.

6

McCoy.

Dr. Knappenberger performed the knee replacement surgery on plaintiff's right knee, on November 14, 1999. Dr. Fairchild examined plaintiff for the first time after his knee surgery on January 17, 2000. He noted that the right knee appeared to be improving, but that plaintiff was still having problems with swelling in both lower extremities and that pinprick and vibratory sense was diminished in the toes. He advised plaintiff to return in three months.

But plaintiff's next examination was by the surgeon, Dr. Knappenberger, who examined him on March 17, 2000. On that date, Dr. Knappenberger signed a note stating that plaintiff should not work until he was examined again on March 31. On March 27, Dr. Knappenberger submitted a signed statement to PRC listing the nature of plaintiff's sickness or injury as "See previous reports & 1) status Post total knee arthroplasty; 2) Peripheral Vascular Disease, particularly of the left lower extremit [sic]." He identified the most recent treatment date as March 17 and described plaintiff's physical restrictions as: "he can not do continued walking due to the pain and burning sensation in his feet. He will have arterial doppler studies." In response to the question, "How do the symptoms interfere with the patient's ability to perform their job functions?," Dr. Knappenberger replied, "Yes."

On March 31, 2000, Dr. Knappenberger examined plaintiff again, and noted that the results of the doppler studies "show that [plaintiff] has excellent blood flow down into the leg and the findings of that were discussed," yet plaintiff continued to complain of the burning sensation in both of his lower extremities. Dr. Knappenberger further noted that "[c]ertainly from a total knee standpoint just individually by itself he would be capable of returning back to work. But with all his other problems that he has, we have both decided that he needs to just consider retirement or disability. . . . Again, this

7

is due to recent knee surgery, this diabetes mellitus, to his neuropathy and exogenous obesity." Dr. Knappenberger signed a work form that stated "Edward is to be off work permanently due to his knee and diabetic neuropathy."

On May 12, 2000, in response to an inquiry from CNA, Dr. Knappenberger indicated that "[plaintiff] will be off of work permanently due to his exogenous obesity and diabetes mellitus with peripheral neuropathy" and attached examination notes from March 2000.[4] On May 26, plaintiff returned to Dr. Knappenberger complaining of pain in his left knee. Dr. Knappenberger indicated that the incision on his right knee was "well healed" and that he had "excellent range of motion;" but he noted that the left knee was subject to degenerative joint disease. Dr. Knappenberger recommended a follow-up appointment in one year.

On July 17, 2000, Dr. Fairchild examined plaintiff, nothing that plaintiff had a longstanding chronic venous insufficiency, "which has been worse on the right side since his earlier surgery." He noted further that pinprick and vibratory sense was absent in the toes, and that there were no skin lesions on the feet or lower extremities. It was further noted that plaintiff was using a cane or walker to ambulate. Dr. Fairchild recommended a follow-up appointment in three months.

In addition to the above described records of treating physicians, the administrative record includes an independent medical review performed by Dr. Stanley Askin, a Board Certified Orthopedic Surgeon, retained by CNA. In February 2000, CNA provided Dr. Askin with certain medical records:(1) the letter from Ann Bush describing the nature of plaintiff's employment activities; (2) a supplemental physician's statement prepared by Dr. Knappenberger's office describing the knee

---

[4] The Court notes that this form was faxed to CNA and signed by Craig L. Vosburgh, M.D.

surgery and stating that plaintiff needed to be off work; (3) the disability claim prepared by plaintiff on

September 23, 1999; and (4) a September 24, 1999 office note of Dr. Fairchild.  Dr. Askin also spoke

to an employee of Dr. Knappenberger, who relayed that Dr. Knappenberger believed plaintiff was

capable of working in a sedentary capacity.  Based on this conversation and above itemized records,

and without physically examining plaintiff, Dr. Askin opined that there was no apparent medical

impairment that precluded plaintiff from returning to work, at least in a sedentary capacity.

 In addition to medical evidence and opinions, CNA investigator Tom McFadden interviewed

plaintiff on the telephone on April 25, 2000.  Plaintiff told McFadden that since his knee surgery, he has

continued to suffer from swelling and ankle burning pain in his right leg, and he has needed the help of a

cane for walking.  He further advised that he tried to keep his leg propped up.  As a result, plaintiff

explained that he tried to keep it propped up.  Plaintiff described his left leg as "black," due to problems

with his veins and tissues.  He also complained that the pain in his lower extremities made it difficult to

concentrate and perform his duties repairing monitors.

 The administrative record also includes records evidencing that plaintiff was awarded Social

Security disability benefits beginning in March 2000 for $1079 per month.  The Social Security

Administration found that plaintiff was disabled, as defined in the Social Security Act, beginning on

September 23, 1999.

### *Denial of Plaintiff's Claim*

 Plaintiff's claim for continued disability benefits was initially denied by a letter dated August 7,

2000, and signed by McFadden.  This denial letter explained:

> [W]e have not been provided with any medical findings, which would
> support that your condition remains of a severity to produce restrictions

9

> preventing you from performing your occupational requirements beyond March 31, 2000.  Although you have other diagnosis [sic] and remain under the care of a physician, there is no medical evidence to establish that these conditions have changed as a result of your knee replacement surgery.

The letter cited the Occupation Qualifier from the Plan for the definition of disability.  The letter also referenced various items of medical evidence in support of the denial of benefits.  The letter further explained that based on plaintiff's receipt of social security benefits, and pursuant to the offset provision in the Plan, plaintiff's long-term disability award for the ten day period of  March 21-31, 2000, was now reduced, and that plaintiff was responsible for an overpayment of $323.70.

On October 2, 2000, plaintiff's attorney submitted a written request for reconsideration of the denial.  Plaintiff's attorney attempted to supplement the record, by enclosing a letter from plaintiff and additional records from Dr. Fairchild, Dr. McCoy, and St. Francis hospital.  McFadden again denied the claim by letter dated October 6, 2000, stating that the new information did not constitute medical evidence that plaintiff's condition was disabling under the Plan as described in the initial denial.  McFadden then forwarded plaintiff's claim to the Appeals Area for review.  In a November 16, 2000 letter addressed to plaintiff's attorney, CNA denied plaintiff's appeal.  Citing the Occupation Qualifier in the Plan, CNA explained that based on plaintiff's medical records, CNA could not conclude that he had functional limitations that would prevent him from performing his job with modifications, or a job with any other employer.

## II.  Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

10

material fact and that the moving party is entitled to judgment as a matter of law."[5]  A fact is only

material under this standard if a dispute over it would effect the outcome of the suit.[6]  An issue is only

genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[7]  The inquiry

essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party

must prevail as a matter of law."[8]

    The moving party bears the initial burden of providing the court with the basis for the motion

and identifying those portions of the record that show the absence of a genuine issue of material fact.[9]

"A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[10]

The burden may be met by showing that there is no evidence to support the nonmoving party's case.[11]

If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set for specific

facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could

find for the nonmovant."[12]  "Where, as here, the parties file cross motions for summary judgment, we

are entitled to assume that no evidence needs to be considered other than that filed by the parties, but

---

[5]  Fed. R. Civ. P. 56(c).

[6]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7]  *Id.*

[8]  *Id.* at 251-52.

[9]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[10]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[11]  *Id.*

[12]  *Id.*

summary judgment is nevertheless inappropriate if disputes remain as to material facts."[13]  When

examining the underlying facts of the case, the Court is cognizant that it may not make credibility

determinations or weigh the evidence.[14]

### III.  Standard of Review and Burden of Proof

The parties stipulate that the appropriate standard of review of Continental's decision to deny

long-term disability benefits is the arbitrary and capricious standard.[15]  But they disagree about the

degree of deference that should be afforded CNA's decision under the arbitrary and capricious sliding-

scale of review articulated by the Tenth Circuit in *Fought v. UNUM Life Insurance Co. of

America*.[16]  There, the Tenth Circuit explained that when a plan administrator or fiduciary under

ERISA retains discretionary authority under the plan to decide eligibility for benefits or the terms of the

plan, the court should apply an arbitrary and capricious standard of review.[17]

Because the parties agree that Continental has discretionary authority to determine eligibility for

benefits and to interpret the terms and provisions of the policy, the arbitrary and capricious standard of

review applies.  Additionally, as Magistrate Judge Sebelius ruled in his November 2, 2004 Order,

under the arbitrary and capricious standard of review, the Court is limited to the administrative record

---

[13]  *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319
(10th Cir. 1997) (citing *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 691-92 (10th Cir.1981)), *cert. denied*, 523
U.S. 1048 (1998).

[14]  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[15]  Pretrial Order, Doc. 34, at 2 ¶ 3e (Nov. 2, 2004).

[16]  379 F.3d 997 (10th Cir. 2004), *cert. denied.*, No. 04-1000, 2005 WL 218389 (U.S. May 2, 2005).

[17]  *Id.* at 1003.

when reviewing an insurer's decision to terminate benefits.[18]  In applying an arbitrary and capricious standard of review, this Court will only consider the arguments and evidence before CNA at the time it made it's decision.[19]

However, "when an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs direct, immediate expense as a result of benefit determinations favorable to plan participants."[20] In the case of a plan administrator or fiduciary operating under a conflict of interest, the conflict must be weighed as a factor in determining whether the decision to terminate benefits was arbitrary and capricious.[21]  The Tenth Circuit had previously adopted a "sliding-scale" approach to address the varying levels of deference given to a conflicted fiduciary's decision.[22]  Under this approach, "the arbitrary and capricious standard may be a range, not a starting point."[23]  The degree of deference to be given is decreased on a sliding scale in proportion to the degree of the conflict.[24]

In *Fought*, the Tenth Circuit crafted the appropriate deference to correspond to either a

---

[18]  *Id.*; *see Allison v. UNUM Life Ins. Co.*, 381 F.3d 1015, 1021 (10th Cir. 2004).

[19]  *Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377, 380 (10th Cir. 1992).

[20]  *Pittman v. Blue Cross & Blue Shield*, 217 F.3d 1291, 1296 (10th Cir. 2000) (*quoted in Fought*, 379 F.3d at 1003).

[21]  *Fought*, 379 F.3d at 1003 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).

[22]  *See id.* at 1004 (citing *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996)).

[23]  *Id.* at 1004 (internal citations omitted).

[24]  *Id.*

standard conflict of interest, or an inherent conflict of interest.[25]   A standard conflict of interest exists

where a "fiduciary may wear two hats, one of a trustee or fiduciary and one of a settlor."[26]   In such a

situation, the plaintiff must prove the existence of a conflict.[27]   However,

> When the plan administrator operates under either (1) an
> inherent conflict of interest; (2) a proven conflict of interest; or (3) when
> a serious procedural irregularity exists, and the plan administrator has
> denied coverage, an additional reduction in deference is appropriate.
> Under this less deferential standard, the plan administrator bears the
> burden of proving the reasonableness of its decision pursuant to this
> court's traditional arbitrary and capricious standard.  In such instances,
> the plan administrator must demonstrate that its interpretation of the
> terms of the plan is reasonable and that its application of those terms to
> the claimant is supported by substantial evidence.  The district court
> must take a hard look at the evidence and arguments presented to the
> plan administrator to ensure that the decision was a reasoned
> application of the terms of the plan to the particular case, untainted by
> the conflict of interest.[28]

The Court finds that there is an inherent conflict of interest in this case, as Continental was the issuer of

the policy and its designee, CNA, exercised its own discretion in determining that plaintiff's claim did

not fall within the coverage of the plan.  The Court must consider as a factor Continental's potential

benefit by denying plaintiff's eligibility for benefits under the terms of the Plan.

Indeed, Continental appears to concede that it has an inherent conflict of interest as the "claim

----

[25] *Id.* at 1005-07.

[26] *Id.* at 1005.

[27] *Id.*

[28] *Id.*

adjudicator and the insurer'[29] of the Plan; therefore, it bears the burden of proving that it meets the traditional arbitrary and capricious standard.  Notably, Continental argues in a footnote that this shift in burden of proof does not apply unless the case involves an exclusion for coverage.  The Court disagrees.  Although *Fought* dealt with a case where the plaintiff's claim was denied based upon a pre-existing condition provision in the Plan, it did not limit its holding to inherent conflicts of interest under that set of facts.  The court merely explained that its formulation of the shift in burden of proof for inherent conflict of interest cases is additionally supported by the fact that prior ERISA case law had imposed such a burden in exclusion cases.[30]

Because the Court finds an inherent conflict of interest in this case, Continental must prove that its interpretation of the policy was reasonable and that its application to plaintiff's claim was based on substantial evidence.  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].  Substantial evidence requires more than a scintilla but less than a preponderance."[31]  In reviewing Continental's decision, the Court will take a hard look at the evidence and arguments presented to Continental to determine if the decision was tainted by the conflict.  Continental maintains that even under this stricter standard, there is

---

[29]   The Court notes that the Plan terms list PRC as the plan administrator.  (Doc. 36, at 23.)  From a review of the administrative record, it appears that PRC submitted much of the paperwork from plaintiff, the company, and/or plaintiff's physicians to CNA.  However, it is clear that PRC had no decision-making authority under the terms of the plan or the framework of the administrative process.  Continental does not appear to contradict that CNA processed plaintiff's claim, interpreted the Plan, and stood to financially gain as the designee of the insurer if plaintiff's claim was unsuccessful.

[30]   *Fought*, 379 F.3d at 1007; *accord Smith v. Metropolitan Life Ins. Co.*, 344 F. Supp. 2d 696, 701(D. Colo. 2004) (explaining that under *Fought*, the level of discretion and standard of review turns on the role of the decisionmaker and not on whether "coverage" or "benefits" are at issue).

[31]   *Sandoval v. Aetna Life & Casualty Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

no genuine issue of material fact over whether its decision to terminate plaintiff's disability benefits was reasonable and based on substantial evidence.

## IV.  Discussion

### A.  Procedural Objections

Continental objects to plaintiff's attempt to attach disclosures made under Fed. R. Civ. P. 26 as part of the summary judgment record.  The Court overrules Continental's objection, as it is moot.  In this case, the Rule 26 disclosures entailed only a list of individuals and entities, along with their addresses, with knowledge of the facts of this case; a request for production of the administrative record; a computation of damages; and a request for production of the Plan.  All of the listed individuals are also referenced in the administrative record.  The only facts derived from the "witness" list in this disclosure are irrelevant to the issues presented on summary judgment.

Continental also objects to plaintiff's citations to certain quoted material based on the "rule of completeness," found in Fed. R. Evid. 106.  The Court sustains this objection and will not consider any fact as undisputed that is not an accurate reflection of material found in the administrative record.

Finally, Continental objects that certain factual statements made by plaintiff do not comport with D. Kan. R. 56.1, which requires all references to undisputed facts to contain a citation to the summary judgment record.  Again, the Court sustains Continental's objection and will not consider as undisputed any fact that is not supported by the summary judgment record.

### B.  Terms of the Plan

Plaintiff argues that Continental was unreasonable in its interpretation of two terms in the Plan: the definition of disability; and the Plan language concerning whether plaintiff's job could be modified to

accommodate his limitations.  The Court will address each in turn.

Plaintiff argues that Continental incorrectly construed the definition of disability in the Plan by requiring that his "injury or sickness" entirely stem from his knee surgery.  The Occupation Qualifier definition of disability requires that the participant's

> *Injury* or *Sickness* cause(s) physical or mental impairment . . . . to such a degree of severity that *You* are: 1. Continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation*; and 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

The Court must only determine if Continental's interpretation of this language is reasonable. Continental's interpretation was that plaintiff was not disabled because his limitations, as they relate to his knee surgery, were not supported by the medical record and preexisted his disability leave.  Further, the medical records indicated continuing improvement in plaintiff's right knee.

The Court finds that plaintiff misconstrued Continental's interpretation of the disability definition provided in the Plan.  Continental's decision did not rely upon an interpretation of disability that required that all limitations be linked to the surgery.  Rather, Continental's decision was primarily based on its finding that plaintiff was not *continually* disabled as contemplated by the Plan, because the medical evidence did not support functional limitations that would prevent plaintiff from working. Plaintiff's true objection is to Continental's application of the Plan to him, which will be discussed below.  The Court finds that there is no genuine issue of material fact concerning whether Continental reasonably interpreted the term "disability" under the Plan.

Plaintiff also objects to Continental's interpretation of the job modification provision in the Plan. The Plan requires that any plan to modify work requirements be in writing and signed by plaintiff.

17

Plaintiff argues that because he did not sign the Job Statement nor the letter from Ann Bush, neither

document complies with this requirement.  Thus, plaintiff submits that any consideration of modified

terms of his job as a Technician II is improper and an unreasonable application of Plan terms.

But the Court finds no genuine issue of material fact that Continental's construction of Plan

terms on this issue was reasonable.  To be sure, the terms of the modification provision do require the

agreement to be in writing in order for the employer to be reimbursed for such accommodation.  This

provision is under the heading: "What Other Services Are Available to *You* while *You* are *Disabled*?"

But this is not a provision that deals with the review process for a claim of disability.  The terms of the

Plan do not prohibit Continental from considering offers by the employer to modify work requirements

when determining a claim for disability.  Again, plaintiff's quarrel is not with Continental's interpretation

of plan terms, but with Continental's application of those terms to him.  The Court finds that Continental

has sustained its burden of proving that its interpretation of the terms of the Plan was reasonable and

untainted by any conflict of interest.

### C.  Application of Plan Terms to Plaintiff

The crux of plaintiff's objections to Continental's denial of coverage concerns its application of

the Plan terms to him.  Under the applicable standard, Continental must prove that its decision was

based upon substantial evidence–or more than a scintilla–and this Court must take a hard look at the

evidence to assure itself that the decision was untainted by any conflict of interest.  Plaintiff argues that

Continental's decision was arbitrary and capricious because Continental: (1) ignored uncontroverted

medical evidence that he is disabled; (2) failed to consider the fact that plaintiff was awarded Social

Security disability benefits; (3) ignored the Job Statement, which stated that he was required to be on

18

his feet for three hours per day; and (4) failed to follow the proper administrative procedures required by federal regulations.  The Court addresses each challenge to Continental's decision in turn, evaluating whether Continental has shown that no genuine issue of material fact exists with regard to its decision, under an arbitrary and capricious standard of review.

### 1.  Objective Medical Evidence

The Plan requires a claimant to submit objective medical findings with a claim for benefits as proof of disability.  The Plan defines objective medical findings as including, but not limited to tests, procedures, or clinical examinations accepted in the practice of medicine.  The Plan also requires proof of the extent of the claimant's disability, including restrictions and limitations that prevent the claimant from performing his regular occupation.

Plaintiff contends that CNA ignored objective medical evidence of changed or ongoing medical conditions since his knee surgery: diabetes mellitus, neuropathy,[32] blackening of the skin in his leg, arthritis in his right ankle, pain in his legs, and the fact that he is not a candidate for surgery.  But CNA reviewed the medical records.  The administrative record shows that CNA considered evidence from Dr. Knappenberger, Dr. Fairchild, St. Francis Hospital, Dr. McCoy, and an independent review by Dr. Askin.  Although the initial denial letter referred only to reports of Dr. Knappenberger and Dr. Fairchild, the appeal denial letter referenced more of the medical record.

CNA did not ignore Dr. Knappenberger's opinion of disability; rather, CNA found that Dr.

---

[32]   The Merck Manual explains that neuropathy in the feet is a common long-term complication for sufferers of diabetes mellitus.  Neuropathy in the feet is described as damage to the nerves, which affects sensation to the feet, so pain is often not felt.  Therefore, "neuropathy" appears to encompass some of the other symptoms that plaintiff cites as part of his disability such as the lack of pinprick response or lack of pulse in his feet. *See Merck Manual of Medical Information*, Hormonal Disorders, Diabetes Mellitus (2d ed. 2003), *available at* www.merck.com (last visited June 20, 2005).

Knappenberger's opinion was not supported by objective medical evidence.[33]  CNA found that the objective medical evidence was that plaintiff left work on September 22, 1999 because of pain in his right knee; and that on November 24, 1999 Dr. Knappenberger performed surgery, replacing the right knee.  CNA found that Dr. Knappenberger's examination notes consistently  reflected improvement in the right knee after surgery.

Moreover, on March 31, 2000, Dr. Knappenberger noted  that "from a total knee standpoint just individually by itself he would be capable of returning to work."  Although Dr. Knappenberger went on to state that "with all his other problems . . . we have both decided that he needs to just consider retirement or disability,"  CNA aptly found that this note does not constitute objective medical evidence.  Rather, this note simply relays a conversation, or an agreement between Dr. Knappenberger and the plaintiff.

Furthermore, despite being given the opportunity on CNA's review forms, Dr. Knappenberger failed to explain or quantify the extent of plaintiff's disability, i.e. what specific functional limitations prevented plaintiff from performing his job.  CNA also gave weight to the fact that at his May 26, 2000 examination of plaintiff, Dr. Knappenberger recommended a follow-up appointment in one year, which of course belies the claim that plaintiff suffered from a "sickness" or "injury" that prevented him from performing his job.

Nor did CNA ignore Dr. Knappenberger's findings concerning plaintiff's complaints of other problems in his lower extremities.  Although the doctor cited probable diabetic neuropathy as a cause

---

[33]  Both letters explained that although the objective medical evidence supported a conclusion that plaintiff had a medical condition, it did not support a finding of disability.

of plaintiff's symptoms, Dr. Knappenberger did not submit evidence of any clinical tests performed

aside from the doppler studies in March 2000, which showed "excellent blood flow" to the leg.  Yet

there were no other "tests, procedures, or clinical examinations" referred to by Dr. Knappenberger or

submitted by him to CNA in support of plaintiff's cited problems with his lower extremities.

CNA also concluded that these other conditions cited by plaintiff existed prior to his surgery.  It

cited medical history from Dr. Fairchild that referred to his diabetes diagnosis in 1982.  Prior to the

November 1999 surgery, Dr. Fairchild's notes also referenced symptoms of neuropathy such as

reduced sensation in the feet to a pinprick test, swelling, and pain, along with plaintiff's problem with

weight.  Moreover, despite Dr. McCoy's advice that plaintiff  lose weight before the knee replacement

surgery, plaintiff weighed 323 pounds at the time of the surgery.  CNA reasonably concluded that this

all evidences that these other conditions and symptoms preexisted plaintiff's surgery.  Rather than

suggesting that these conditions must have originated with the knee surgery, CNA points out that none

of the objective medical evidence supports that these conditions were worsened by the knee surgery.

Furthermore, CNA rejected Dr. Knappenberger's opinion because his diagnosis and

description of disabling conditions appeared to change over time, calling his credibility into question.  In

February 2000, he stated plaintiff's diagnosis as severe degenerative joint disease, pattelofemoral joint,

right knee and long-standing diabetes, and possible diabetic neuropathy type of pain in the lower

extremity.  On  March 27, 2000, Dr. Knappenberger submitted a signed statement to PRC listing the

nature of plaintiff's sickness or injury as "See previous reports & 1) status Post total knee arthroplasty;

2) Peripheral Vascular Disease, particularly of the left lower extremit [sic]."  Four days later, on March

31, 2000, Dr. Knappenberger cited plaintiff's conditions as the recent knee surgery, diabetes mellitus,

neuropathy, and exogenous obesity.  And on May 12, 2000, he stated that plaintiff should not work because of exogenous obesity and diabetes mellitus with peripheral neuropathy, along with degenerative joint disease in the left leg.  In fact, Dr. Knappenberger's inconsistent diagnoses led CNA, in May 2000, to seek additional objective medical evidence to determine the nature of plaintiff's continuing disability.

Plaintiff suggests that Continental acted in bad faith because it knew that Dr. Knappenberger was on vacation at the time that Continental requested records from him.  Plaintiff fails, however, to develop this allegation into an argument.  The record shows that CNA attempted to contact Dr. Knappenberger in May 2000 to acquire objective medical evidence, during its investigation of plaintiff's claim.  Dr. Vosburgh signed a typed response to the form questionnaire submitted to Dr. Knappenberger.  There is no evidence in the record that supports the bad faith argument alleged.

Under the Plan, plaintiff was required to submit objective medical evidence, such as tests and clinical findings, as proof of his continuing disability.  The Court finds that Continental has sustained its burden of coming forward with substantial evidence to support its rejection of plaintiff's claim on this ground.  Continental cited objective medical evidence that suggested plaintiff's limitations were strictly due to conditions that predated the knee replacement surgery, and were not aggravated by the surgery to a degree that would meet the Plan definition of disability.  It found that the symptoms of neuropathy, discoloration, swelling and pain in his legs, and diabetes were all documented by medical evidence before Dr. Fairchild referred plaintiff to an orthopedic surgeon for possible right knee replacement surgery and before plaintiff was unable to work.  Furthermore, there were no tests or clinical findings in the administrative record that showed these conditions worsened after his surgery.

In sum, the only evidence Continental discounted, was Dr. Knappenberger's opinion, which relied only on plaintiff's subjective complaints, and which was not supported by any objective medical evidence.  Plaintiff's reliance on medical evidence of other conditions or symptoms, is of no avail. None of this medical records:(1) specifically describes his functional limitations, or (2) opines that the conditions render him unable to perform his job or any job for which he may qualify.  Most of these notations simply relay plaintiff's subjective complaints of functional limitations, not a physician's objective findings of such.

Dr. Fairchild, for example, examined plaintiff for a number of years prior to surgery and noted that plaintiff demonstrated the symptoms that he now complains of as far back as January 1999.  Yet in July 2000, Dr. Fairchild did not note any skin discoloration or lesions on plaintiff's extremities.  And although he noted that plaintiff suffered from longstanding venous insufficiency that had been worse on the right side since surgery on the right knee, Dr. Fairchild did not recommend a follow-up appointment for three months, nor did he opine that plaintiff's functional limitations rendered him unable to work.

Continental also relied on Dr. Askin's report, which also supported its decision.  Plaintiff contends that this non treating physician's opinion should be accorded little weight because he never examined plaintiff and was only provided with a fraction of his medical records.  Plaintiff also suggests that because CNA did not explicitly rely on Dr. Askin's opinion in the initial denial, it should not be considered part of the administrative record.  But the Tenth Circuit explained in *Fought* that where "a conflict of interest may impede the plan administrator's impartiality, the administrator best promotes the

purposes of ERISA by obtaining an independent evaluation.'[34]  Moreover, *Fought* does not require that the review rely upon a physical examination of the claimant.  In contrast to the social security disability review process, nothing in ERISA or its regulations requires the court to accord special deference to the opinions of treating physicians.[35]

In this instance, the Court determines that there is no genuine issue of material fact concerning whether Continental is able to demonstrate more than a scintilla of objective medical evidence to support its decision, with or without the report by Dr. Askin.   Plaintiff's own treating physicians failed to provide conclusive, consistent opinions about plaintiff's functional limitations or his disabling condition(s).  Therefore, although Dr. Askin's report buttresses Continental's determination, it is not essential.

## 2.  Social Security Award

Plaintiff claims that Continental's decision was arbitrary and capricious because it did not give weight to the fact that plaintiff was found disabled under the Social Security Act and awarded benefits. Plaintiff further argues that Continental holds contradictory positions by claiming, on the one hand, that it is not bound by the Social Security award, while on the other hand subjecting his long-term disability award under the Plan to an offset of social security benefits received.  While the administrative record demonstrates that CNA was informed of plaintiff's award of Social Security benefits, the record does not demonstrate that CNA considered the findings made by the Social Security Commissioner.  Such

---

[34] *Fought v. UNUM Life Ins. Co.*, 379 F.3d 997, 1015 (10th Cir. 2004), *cert. denied.*, No. 04-1000, 2005 WL 218389 (U.S. May 2, 2005).

[35] *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823 (2003).

findings are not part of the record.  Therefore, the Court finds that there is a genuine issue of material fact over how much weight, if any, CNA afforded plaintiff's Social Security award.  Standing alone, however, this does not defeat Continental's showing that its decision was based on substantial evidence, since the criteria for deciding whether to award Social Security benefits are different from the criteria set forth in the Plan, and CNA was not bound by findings made in the social security case.[36]

### 3.  Job Statement

Plaintiff contends that CNA's decision was arbitrary and capricious, because it ignores the Job Statement that evidenced his job required him to be on his feet three hours a day.  Plaintiff further contends that he was not informed of any offer by PRC to modify the requirements of his job to accommodate his medical condition.

Under the Plan, CNA found that plaintiff was "continuously []able to perform the Material and Substantial Duties" of his job.  The Plan defines "Material and Substantial Duties," as "the necessary function of *Your Regular Occupation* which cannot be reasonably omitted or altered."  In making this finding, it is clear from McFadden's denial letter that CNA relied on the Job Statement in applying the plan provision to plaintiff's set of circumstances.  McFadden explained that plaintiff's regular occupation required him to sit for the majority of the time.  This was consistent with the Job Statement, which stated that plaintiff's job required sitting for five hours per day.  McFadden also relied on PRC's statement that plaintiff could be accommodated, by getting a co-worker to help with the lifting

---

[36] *Smith v. Metropolitan Life Ins. Co.*, 344 F. Supp. 2d 696, 703 (D. Colo. 2004) (citing *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000)); *cf. Eye v. Metropolitan Life Ins. Co.*, 202 F. Supp. 2d 1204, 1211 (D. Kan. 2002) (explaining that although a social security determination is not binding, there was no evidence in the record that it was even considered).

requirements of the job.  Plaintiff does not controvert this finding, rather plaintiff merely objects that there was no written modification plan communicated to him and bearing his signature.

The Court will address the procedural arguments made by plaintiff in the next section.  Plaintiff does not present a genuine issue of material fact that he would be unable to perform the "Material and Substantial Duties" of his job, as it is defined under the Plan, nor does he point to evidence other than the Job Statement to support this contention.[37]

### 4.  Administrative Procedures

Plaintiff argues that Continental: (1) violated federal regulations by not adequately providing the basis for the denial to plaintiff; and (2) failed to ask plaintiff to provide it with medical evidence of his specific restrictions that prevented him from working.  Plaintiff asks the Court to take judicial notice of 29 C.F.R. 2560.503-1(g).[38]  The relevant portion of that regulation provides:

(g) Manner and content of notification of benefit determination.
(1) Except as provided in paragraph (g)(2) of this section, the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv). The notification shall set forth, in a manner calculated to be understood by the claimant--
(i) The specific reason or reasons for the adverse determination;
(ii) Reference to the specific plan provisions on which the determination is based;
(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

---

[37]  Plaintiff suggests that CNA was inconsistent in explaining which "Qualifier" under the Plan he failed to satisfy in order to prove disability.  Despite the fact that plaintiff fails to develop this argument, the Court notes that CNA consistently cited the Occupation Qualifier as a basis for denial of the claim.  That Qualifier required both an inability to continuously perform the material and substantial duties of his regular occupation, and that he not be working for wages in *any occupation* that he is or could be qualified for.  This provision of the Plan was quoted in both the initial denial letter, as well as the appeal denial letter.

[38]  Although plaintiff repeatedly cites 29 C.F.R. 2560.503-1(f), the Court agrees with Continental that plaintiff likely intended to cite 29 C.F.R. 2560.503-1(g), which governs the manner and content of notification of benefit determinations; whereas subsection (f) only deals with the timing of such notifications.

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review; . . .[39]

The authority for this regulation is derived from 29 U.S.C. § 1133, which requires every covered plan to provide adequate notice to a participant whose claim is denied, setting forth the specific reasons for denial.[40]   It also requires the plan to allow such a participant a full and fair review of the decision.[41]

Plaintiff raises this argument for the first time in his summary judgment briefs.  The pretrial order states that plaintiff only asserts one theory of recovery: that Continental's decision to deny him long-term disability benefits was arbitrary and capricious pursuant to 29 U.S.C. § 1132(a)(1)(B).  He has previously asserted no claim for a violation of section 1133, which provides the authority for the regulations plaintiff asks this Court to take judicial notice of.  In any event, a plaintiff who alleges a violation of ERISA's procedural requirements may not recover against a plan administrator, but only has a remedy against the plan itself.[42]

Even if a private cause of action was available to plaintiff for a violation of these regulations, plaintiff failed to assert such an allegation in the pretrial order.  Rule 16(e) of the Federal Rules of Civil Procedure provides that the pretrial order "shall control the subsequent course of action unless modified by a subsequent order."  "An order entered pursuant to Rule 16(e) supersedes the pleadings and

---

[39]   29 C.F.R. 2560.503-1(g)(1).

[40]   29 U.S.C. § 1133(1).

[41]   29 U.S.C. § 1133(2).

[42]   *Walter v. Int'l Ass'n of Machinists Pension Fund*, 949 F.2d 310, 315-16 (10th Cir. 1991); *Devers v. Quivira, Inc.*, 35 F. Supp. 2d 1282, 1288 n.10 (D. Kan. 1998).

controls the subsequent course of litigation. . . . 'the pretrial order measures the dimensions of the lawsuit, both in the trial court and on appeal.'"[43]  The Court finds that the pretrial order does not describe the acts or omissions that give rise to an allegation that defendant failed to follow the appropriate procedures in deciding plaintiff's claim.  It also does not explain any allegation of the sort. Because plaintiff failed to advance this argument in the pretrial order, it is waived.[44]

Plaintiff suggests that Continental improperly failed to advise him of the medical evidence necessary to "perfect his claim," violating the cited regulations.  The Court will limit its analysis of this argument to whether or not this evidence may present a genuine issue of material fact concerning whether Continental was arbitrary and capricious.  The Tenth Circuit dealt squarely with this issue in *Gaither v. Aetna Life Insurance Co.*[45]  In that case, plaintiff urged that  defendant had a duty to obtain more information about his claim before denying benefits, and that failure to do so was evidence that defendant acted arbitrarily and capriciously.[46]  The court explained that, "nothing in ERISA requires plan administrators to go fishing for evidence favorable to a claim when it has not been brought to their attention that such evidence exists."[47]  However, the court went on to explain that it must not

---

[43]   *Tyler v. City of Manhattan*, 118 F.3d 1400, 1403 (10th Cir. 1997) (quoting *Hullman v. Bd. of Trustees*, 950 F.2d 665, 668 (10th Cir. 1991) (internal citation omitted)).

[44]   *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 822 (10th Cir. 1996) (explaining that a general reference to ERISA violations in the pretrial order is insufficient to preserve procedural issues for appeal when not raised in the district court); *see, e.g.*, *Devers*, 35 F. Supp. 2d at 1288 n.10 ("As an initial matter, plaintiff failed to assert in the pretrial order any claim for civil penalties stemming from defendant's untimely response. Thus, any cause of action plaintiff may have had arising out of defendant's untimely response to his claim for benefits is deemed waived and the court need not address it.").

[45]   394 F.3d 792 (10th Cir. 2004).

[46]   *Id.* at 804.

[47]   *Id.*

28

only look to the minimum requirements under ERISA, but to the terms of the plan itself to evaluate

whether a decision is arbitrary and capricious.[48]

Here, plaintiff makes a sweeping claim that defendant violated an ERISA regulation and that

this is proof of an arbitrary and capricious decision.  Plaintiff fails to point to any specific language in the

Plan that supports this claim.  As already discussed, the Plan explicitly provides that plaintiff must

submit certain types of items as proof of disability.  The Plan also provides,

> *You* may be asked to submit proof that *You* continue to be *Disabled*
> and are continuing to receive *Appropriate and Regular Care* of a
> *Doctor*.  Requests of this nature will only be as often as *We* feel
> reasonably necessary.  If so, this will be at *Your* expense and must be
> received within 30 days of *Our* request.

The language in the Plan is similar to defendant's plan language in *Gaither*–it requires the

insurance company to request the necessary information, but requires the claimant to then submit the

requested information.  Unlike in *Gaither*, CNA did request the objective medical evidence from Dr.

Knappenberger that it needed to evaluate plaintiff's claim.  On May 12, 2000, Patricia LaBerge, the

nurse case manager handling plaintiff's case for CNA, faxed Dr. Knappenberger a request for

information stating:

> [Y]ou have recommended permanent disability/retirement due to all of
> his problems, not just his knee surgery.  I need clinical evidence to
> support that, as well as any restrictions you could recommend.  I have
> attached a copy of his Job Activity Statement.  Please review it,
> complete this questionnaire, and fax your responses to me.  Please
> attach any supportive clinical notes.

---

[48] *Id.*

Dr. Knappenberger's response to this request was signed by Dr. Craig Vosburgh.  He attached the examination notes from plaintiff's examinations on March 21 and March 31, 2000 that CNA had already received.

Therefore, even when information was requested, Dr. Knappenberger failed to provide CNA with the objective evidence it requested to support his opinion.  Even before this request was made, Dr. Knappenberger failed to provide CNA with information it asked on claim forms.  In the initial claim form, he left blank the space where he was to fill in plaintiff's physical limitations.  In his March 27, 2000 statement to PRC, he did not answer the questions about how plaintiff's symptoms affect his job functions.

In *Gaither*, the court concluded that the defendant's decision was arbitrary and capricious because it made no attempt to contact a doctor to obtain clarification of an uncontroverted medical condition.  The situation in this case is much different, primarily for two reasons.  First, CNA did attempt to acquire additional objective medical evidence and proof of disability on a number of occasions.  Second, CNA based its denial on the fact that, after acquiring all of the objective medical evidence, there was no support for a finding of disability under the terms of the Plan.  The Court finds that Continental has shown a lack of evidence to support any genuine issue of material fact on this issue. Moreover, plaintiff is unable to point the Court to any evidence that would create a genuine issue of material fact on the issue.  Plaintiff does not contend that objective medical evidence existed that CNA failed to obtain during the course of its investigation.  Instead, plaintiff appears to argue that CNA was required to outline in its denial the test results or other evidence that would justify it granting long-term disability benefits.  There is no basis in law for such an assertion.  The Court finds that under both

ERISA and the Plan terms, there is no genuine issue of material fact that CNA reasonably interpreted the Plan and supported that decision with substantial evidence.

## V.  Conclusion

The Court finds that, under an arbitrary and capricious standard of review, summary judgment is appropriate in favor of the defendant, Continental.  Continental has shown that there is no genuine issue of material fact as to whether its interpretation of Plan terms is reasonable.  Further, Continental has shown that there is no genuine issue of material fact over whether application of the Plan terms to the plaintiff were supported by more than a scintilla, but less than a preponderance of the evidence.  Due to Continental's inherent conflict of interest, the Court has taken a hard look at the evidence and arguments presented during the investigation and determines that it was untainted by the conflict of interest.  Similarly, plaintiff is unable to demonstrate upon its motion for summary judgment a genuine issue of material fact under the arbitrary and capricious standard, even considering the lesser deference that this Court is to attribute to Continental's decision.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Plaintiff's Motion for Summary Judgment (Doc. 35) is **DENIED** and defendant's Motion for Summary Judgment (Doc. 42) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this  __19th__  day of July 2005.

 _S/ Julie A. Robinson_____
Julie A. Robinson
United States District Judge

31

_Holt v. Continental Casualty, Case 04-4050-JAR Memorandum & order granting defendant's motion for summary judgment & denying plaintiff's motion for summary judgment_

32